**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-21004
Summary Calendar
_____


ENRON PETROCHEMICALS COMPANY,
A DIVISION OF ENRON GAS LIQUIDS, INC.,

                                    Plaintiff-Appellant,

versus

THE BARGE DXE 233, et al.,

                                    Defendants,

DIXIE CARRIERS, INC.,

                                    Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Texas
(3:94-CV-533-D)
_____

September 10, 1996
Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

      This admiralty suit arises out of the contamination of a
shipment of methanol delivered to Enron Petrochemicals Company
("Enron") by a barge owned by Dixie Carriers, Inc. ("Dixie").  The
parties submitted cross-motions for summary judgment, and the
district court, finding that a clause in the contract absolved

      [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion
should not be published and is not precedent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

Dixie of liability, granted Dixie's motion.  We affirm.

## I.

Dixie entered into a charter party agreement or "blanket agreement" (the "Agreement") with Tenneco Menthol Company ("Tenneco") that provided the terms and conditions of any subsequent contract of affreightment between them.  The Agreement provided Tenneco with the option to utilize Dixie's barges for commercial shipping.  Enron purchased Tenneco and assumed its rights, responsibilities, and obligations under the Agreement and any subsequent contracts of affreightment.

Enron later exercised the option, requesting that Dixie supply a barge to ship 20,000 barrels of methanol.  Dixie tendered the DXE 233, which had most recently shipped 10,000 barrels of methanol, to Enron as "last cargo methanol."  After Enron's cargo had been discharged, it was found contaminated with acrylonitrile.

## II.

We review a grant of summary judgment *de novo*.  *Hanks v. Transcontinental Gas Pipe Line Corp*., 953 F.2d 996, 997 (5th Cir. 1992).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The party seeking the summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial.  *Hanks*, 953 F.2d at 997.

We begin our determination by consulting the applicable substantive law to determine what facts and issues are material. *King v. Chide*, 974 F.2d 653, 655-56 (5th Cir. 1992).  We then review the evidence relating to those issues, viewing the facts and inferences in the light most favorable to the non-movant.  *Id.*  If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented.  *Celotex*, 477 U.S. at 327.


III.

The threshold question is whether clause 22 of the Agreement absolves Dixie of liability for the cargo contamination.[1]  The

---

[1] The relevant provisions of clause 22 state:

**INSURANCE AND MARINE PERILS**: . . . [Enron] hereby acknowledges that the towage rate specified herein does not contemplate or include liability for loss of or damage to the cargo or an allowance for liability insurance covering the cargo, and as additional consideration supporting [Dixie's] undertakings[,] [Enron] shall and it does hereby agree to hold [Dixie] . . . harmless from claims for cargo . . . contamination, whether arising or resulting from an act of neglect or default in the navigation or
(continued...)

district court concluded that clause 22 prevents Enron from recovering from Dixie for cargo contamination.

With regard to that specific holding, Enron argues that clause 22 should not be interpreted to cover breach of the implied warranty to use due diligence. Specifically, Enron argues that courts disfavor contractual provisions that relieve vessel owners of liability for breaches of warranty. Moreover, Enron argues that clause 21,[2] when read in conjunction with clause 22, demonstrates that the agreement does not absolve Dixie of liability for breaches

---

(...continued)
        management of the tow, including but not limited to explosion, fire, collision, stranding, salvage, operations, equipment defects, or other peril, danger or accident of navigable waters or from any other cause of whatsoever kind arising. In furtherance hereof, [Enron] agrees to secure and maintain in effect a contract of cargo insurance, to the full market value of all cargoes transported hereunder, insuring against all marine risks and perils, including loss, damage, contamination, salvage and general average contributions, etc., and to have [Dixie's] name inserted as an additional insured in said policies, with loss payable to [Enron] and [Dixie] as their respective interests may appear, and [Dixie] shall be deemed to be co-insured, whether so named or not, or to secure a waiver of assignment and/or subrogation from the cargo underwriters in favor of [Dixie] on account of any cargo claims paid by such underwriters. In the event that [Enron] shall fail to procure and maintain insurance as
provided herein, [Enron] shall be liable to and hold [Dixie] harmless from any claims or demands, losses, cost and expenses, to the same extent that the required insurance would have protected [Dixie]: and in any claim or suit for cargo loss or damage, it will be presumed that such insurance, if it had been procured and maintained would have covered the occurrence, loss or damage in question. . . .

        [2] The relevant provisions of clause 21 state:

        **FORCE MAJEURE**: [Dixie] . . . shall not, unless otherwise in this charter expressly provided, be responsible or liable in any way for any loss or damage or for any failure or delay in performance hereunder, arising or resulting from: . . . unseaworthiness of the tow *unless caused by want of due diligence on the part of [Dixie]* to make the tow seaworthy or to have it properly manned, equipped and supplied: or from any other cause of whatsoever kind arising without the actual fault or privity of [Dixie].

(Emphasis added.)

4

of its warranty to use due diligence.

Central to Enron's argument is the mischaracterization of clause 22 as a waiver of liability. It is no such thing; rather, it is a compulsory insurance clause that shifts the cost of procuring cargo insurance from the carrier to the shipper. *See Twenty Grand Offshore, Inc. v. West India Carriers, Inc.*, 492 F.2d 679, 682 (5th Cir.), *cert. denied*, 419 U.S. 836 (1974). In return for a lower shipping charge, Enron agreed to pay for the cargo insurance that Dixie normally would provide.[3]

The clause requires Enron "either to obtain marine cargo insurance or to assume liability for those losses that would be covered by such a policy." *Dow Chem. Co. v. Ashland Oil, Inc.*, 579 F.2d 902, 904 (5th Cir. 1978) (describing how compulsory insurance contracts work). If Enron elects to procure cargo insurance, Enron recovers its loss from the insurance underwriter, and the underwriter is unable to recover from Dixie based on the waiver of subrogation or the co-insured clause.[4] If Enron elects to forgo

---

[3] The relevant portion of clause 22 states, "[Enron] hereby acknowledges that the towage rate specified herein does not contemplate or include liability for loss of or damage to the cargo or an allowance for liability insurance covering the cargo . . . . In furtherance hereof, [Enron] agrees to secure and maintain in effect a contract of cargo insurance, to the full market value of all cargoes transported hereunder. . . ."

[4] The portion of clause 22 that allows Dixie to recover under the insurance states that Enron will "have [Dixie's] name inserted as an additional insured in said policies, with loss payable to [Enron] and [Dixie] as their respective interests may appear, and [Dixie] shall be deemed to be co-insured, whether so named or not, or to secure a waiver of assignment and/or subrogation from the cargo underwriters in favor of [Dixie] on account of any cargo claims paid by such underwriters."

the insurance, it has chosen to self-insure.[5] *Id.* In either case, Dixie is absolved of liability only for those risks that normally would be covered by a marine cargo insurance policy. *Id.*

Because clause 22 is not a waiver of liability, Dixie properly argues that Enron misunderstands the impact of clause 22. The premise of Enron's argument is that a waiver of liability must be explicit[6] and that clause 21, which does waive liability explicitly, excluded breach of warranty of due diligence. From those two propositions, Enron extrapolates that clause 22, which does not exclude liability for the breach of due diligence, cannot waive liability for its breach. In addition to the logical leap in Enron's argument, the problem with the argument is that clause 22 does not waive liability; Dixie is still liable for any damage that the cargo insurance normally does not cover.[7] *Id.*

---

[5] The provision in clause 22 that treats Enron as self-insured states: "In the event that [Enron] shall fail to procure and maintain insurance as provided herein, [Enron] shall be liable to and hold [Dixie] harmless from any claims or demands, losses, cost and expenses, to the same extent that the required insurance would have protected [Dixie]. . . ."

[6] *See In re Carib Prince*, 170 U.S. 655, 659-60 (1898); *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 692 (5th Cir.), *cert. denied*, 400 U.S. 832 (1970).

[7] Thus, the proper way for Enron to challenge Dixie's claim that it is free of liability is to argue that standard cargo insurance does not cover breaches of the duty to use due diligence. Enron, however, conceded in its cross-motion for summary judgment that if the agreement is given effect, Dixie is absolved from liability.

Moreover, the only time Enron argues that the insurance contract does not cover this claim is in its reply brief. Raising a claim for the first time in a reply brief is insufficient to preserve an argument on appeal. *Northwinds Abatement, Inc. v. Employers Ins.*, 69 F.3d 1304, 1308 n.3 (5th Cir. 1996); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir.) ("An appellant abandons all issues not

(continued...)

6

IV.

In the alternative, Enron advances two reasons why this court should not uphold clause 22: first, the contract never became operable; and second, even if it did become operable, it was voidable. We address each in turn.

A.

Enron provides three reasons why the Agreement never became operable. We disagree with all three.

1.

Enron first argues that the contract is void because Dixie failed to meet several conditions precedent to the agreement. Enron relies on the preamble, clauses 4 and 10, to support its claim.[8] Enron argues that clauses 4 and 10 establish that Dixie must tender a barge that is capable of carrying methanol. Relying on the preamble, which states that Enron "hires a tow for transpor-

---

(...continued)
raised and argued in its *initial* brief on appeal."), *cert. denied*, 115 S. Ct. 189 (1994). For that reason, Enron has waived any argument that the cargo insurance does not cover damage caused by Dixie's breach of implied warranties.

[8] Clause 4 states:

    CARGO:      Methanol - 10M Bbls or 20M Bbls minimum.

Clause 10 states:

    PREVIOUS CARGO:  Methanol or tendered suitable to load intended cargo as determined by Charterer's terminal representation or independent surveyor.

7

tation . . . upon the following terms and conditions," Enron claims that the characteristics of the barge are a condition precedent to the remainder of the contract.

Under Texas law, a condition precedent invalidates a contract if (1) the contract creates a condition precedent and (2) the condition precedent is not met. *Texas Dept. of Housing & Community Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th Cir. 1995). A condition precedent is an act or event that *must* take place before performance of a contractual obligation is due. *Huhenberg Brothers Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).

The law does not favor conditions precedent. *Sirtex Oil Indus. v. Erigan*, 403 S.W.2d 784, 787 (Tex. 1966). In determining whether a condition precedent exists, a court must glean the intent of both parties by looking at the *entire* contract. *Citizens Nat'l Bank v. Texas & P. Ry.*, 150 S.W.2d 1003, 1006 (Tex.), *cert. denied*, 314 U.S. 656 (1941). Specific words can be important in overcoming the legal presumption against conditions precedent:

> In order to make performance specifically conditional, a term such as 'if,' 'provided,' 'on condition that,' or some similar phrase of conditional language must normally be included. If no such language is used, the terms will be construed as a covenant in order to prevent a forfeiture. While there is no requirement that such phrases be utilized, their absence is probative of the party's intention that a promise be made, rather than a condition imposed.

*Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d

945, 948 (Tex. 1990) (citations omitted).  The effect of a condition will be confined to those parts of the contract to which the condition specifically relates.  *Christofferson v. Halliburton Co.*, 617 F.2d 403, 406-07 (5th Cir. 1980).

Read broadly, as Texas law requires,[9] the Agreement does not condition clause 22 on clause 4 or 10.  In fact, nowhere in clause 22 or any other clause does language appear suggesting a connection with, or dependence on, another clause.  The district court correctly observed that this contract arose when the parties entered into the Agreement and that Dixie's fulfillment of each provision is an entirely separate matter.

2.

Enron next asserts that the Agreement was inoperable because Dixie failed to tender exact performance, violating clauses 4, 10, and 16.  The premise of Enron's argument is that the option contract between it and Dixie would become operable only when both parties met all their obligations.

Enron can cite no law to support its argument.  When Enron requested Dixie's barge, as both parties stipulate it did, it exercised its option under the AgreementSSand the contract became bilateral.  *Western Federal Sav. & Loan Ass'n v. Atkinson Fin.*

---

[9] *Citizens Nat'l Bank*, 150 S.W.2d at 1006 ("It is not usually proper to consider a single paragraph, clause or provision of a contract by itself in order to ascertain its meaning but each and every part so that the effect or meaning of one part or any other part may be determined." ).

9

*Corp.*, 747 S.W.2d 456 (Tex. App.SSFort Worth 1988, no writ). Consequently, Dixie's performance (or lack thereof) of clauses 4, 10, and 16 makes no difference regarding the contract's operability.

3.

Third, Enron claims that because it was not obligated to purchase anything from Dixie (as each contract of affreightment went into effect entirely at Enron's discretion), the Agreement lacked the necessary consideration or mutuality of obligation to make the contract operable. Consideration makes mutuality unnecessary for the existence of a contract: "With option contracts that are supported by consideration there is no requirement of mutuality of obligation because by their very nature, one party is obligated to perform at the election of the other who is not bound by any executory obligation." *Hott v. Pearcy/Christon, Inc.*, 663 S.W.2d 851, 854 (Tex. App.SSDallas 1983, writ ref'd n.r.e.). Indeed, clause 22 expressly states that lower freight rates served as consideration for absolving Dixie of liability.[10]

Moreover, even if the Agreement lacked consideration, it became operable as soon as Enron requested the barge from Dixie.

---

[10] Clause 22 states that "as additional consideration supporting [Dixie's] undertakings, [Enron] shall and it does hereby agree to hold [Dixie] . . . harmless from claims for cargo."

10

*El Paso Natural Gas Co. v. Western Bldg. Ass'n*, 675 F.2d 1135, 1140 (10th Cir. 1982).[11]  Once Enron exercised its option, the contract became bilateral and bindingSSand all provisions, including clause 22, kicked in.  We thus reject Enron's claim that the Agreement is inoperable for want of mutuality.

### B.

As an alternative ground for not giving full force to the contract, Enron asserts that the AgreementSSin particular, clause 22SSshould be voided.  To this end, it offers three theoriesSSfraud, negligent misrepresentation, and breach of the warranty of seaworthinessSSexplaining why we should rescind the entire contract.  All three arguments fail, however, because rescission is not a viable remedy.

Rescission should be granted only when both parties can be returned to the *status quo ante*.  10 TEX. JUR. 3d *Cancellation and Reformation of Instruments* § 40 (1980); *United States v. Texarkana Trawlers*, 846 F.2d 297, 304-05 & n.20 (5th Cir.) (applying federal common law and discussing Texas law), *cert. denied*, 488 U.S. 943 (1988).  Here, we cannot put both Dixie and Enron in their pre-contract positions.  Even if it were to compensate Enron for the

---

[11] *See also Western Fed.*, 747 S.W.2d at 461; *Tye v. Apperson*, 689 S.W.2d 320, 323 (Tex. App.SSFort Worth 1985, writ ref'd n.r.e.); *Advance Components, Inc. v. Coodstein*, 608 S.W.2d 737, 740 (Tex. Civ. App.SSDallas 1980, writ ref'd n.r.e.); *Ferguson v. von Seggren*, 434 S.W.2d 380, 385 (Tex. Civ. App.SSDallas 1968, writ ref'd n.r.e.).

cargo contamination, Dixie would still be out of pocket for the amount it paid Enron. By the same token, leaving Dixie in the same economic position *status quo ante* fails to return to Enron the value of the uncontaminated cargo. Consequently, the contract cannot be rescinded, and it is not voidable under any of Enron's three theories.

IV.

Enron's final argument is that a breach of contract cannot go unremedied. Assuming *arguendo* that Dixie did breach the Agreement, we are unpersuaded by Enron's siren call. Enron may still recover for the cargo contamination under the cargo insurance it procured. If the insurance covers Dixie's conduct, then Enron has received the benefit of the bargainSSit paid lower shipping rates and bore the cost of buying insurance. If, as we suspect, Enron cannot recover from its underwriters, it did have a remedy. The unavailability of cargo insurance to cover this particular fact pattern is an absolute bar to the operation of clause 22. *See Ashland Oil*, 579 F.2d at 904. If Enron had made that argument, it might have prevailed; it chose not to do so. *See supra* note 7. We do not fashion remedies to compensate a party for its litigation strategy.

AFFIRMED.